942 F.2d 551
 60 USLW 2190, 21 Bankr.Ct.Dec. 1619,
Bankr. L. Rep. P 74,211
 In re Jack Elvin LITTLETON, Karen Littleton, Joel Dean
Moore, Eunice Eileen Moore, dba K & V Applied
Music, Debtors.
TRANSAMERICA COMMERCIAL FINANCE CORPORATION (formerly known
as "Borg-Warner Acceptance Corporation"), Appellant,
v.
Jack Elvin LITTLETON, Joel Dean Moore and Eunice Eileen
Moore, Appellees.
 No. 90-15002.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 9, 1991.
Memorandum Filed May 7, 1991.
Order and Opinion Filed Aug. 12, 1991.
 
 Ronald H. Sargis, Hefner, Stark & Marois, Sacramento, Cal., for appellant.
 Mark W. Briden, Redding, Cal., for appellees.
 Appeal from the Bankruptcy Appellate Panel for the Ninth Circuit.
 Before PREGERSON, NOONAN and THOMPSON, Circuit Judges.
 ORDER
 The memorandum disposition filed May 7, 1991, 931 F.2d 897, is redesignated as a per curiam opinion.
 OPINION
 PER CURIAM:
 
 BACKGROUND
 
 1
 Transamerica Commercial Finance Corporation (formerly known as "Borg-Warner Acceptance Corporation" or BWAC) is a commercial lending company that provides inventory financing to retail businesses.[1] Debtors Jack Elvin Littleton, Joel Dean Moore, and Eunice Eileen Moore were the officers, directors, and shareholders of Jacob's Appliance and TV, Inc. (Jacob's). Jacob's primary business was the service and sale of appliances. In February 1985, Jacob's entered into a "Security Agreement and Power of Attorney" (security agreement) with Transamerica to finance inventory purchases. The security agreement gave Transamerica a security interest in both the inventory purchased by Jacob's and the proceeds from the sale of the inventory. In addition, the security agreement provided that the cash proceeds from each sale would be held in a segregated account. The debtors, however, never established a segregated account. Jacob's paid Transamerica by writing checks drawn from its general business account. Transamerica knew of this arrangement yet still accepted the checks.
 
 
 2
 The security agreement required Jacob's to pay Transamerica the cost price of the financed inventory as sales occurred. To monitor Jacob's compliance with the security agreement, Transamerica conducted monthly inspections of the inventory located on the premises. If Transamerica determined that inventory had been sold without payment of the cost price, Transamerica demanded immediate payment of the cost price.
 
 
 3
 Jacob's paid Transamerica in one of two ways. First, Jacob's was to report sales of inventory on a weekly basis and pay for the sold inventory each week. Second, at the time of Transamerica's monthly inspections, Jacob's was to pay Transamerica for any sold inventory for which a weekly payment had not yet been made. Unless Jacob's could satisfactorily explain why certain items were not on the premises during the monthly inspections, they were presumed sold, and Jacob's had to pay for them.
 
 
 4
 The security agreement also provided that if Jacob's defaulted, Transamerica was entitled immediately to reclaim its collateral. A default under the security agreement was defined as, among other things, the failure to pay amounts to Transamerica as they became due. Jacob's paid Transamerica up to and including June 5, 1986 for all inventory identified as sold. Jacob's made these payments by a regular weekly remittance or at the time of the monthly inspections. On July 24, 1986, the debtors filed a Chapter 11 petition for Jacob's. At this time, Jacob's owed Transamerica $70,068.02 from the sale of financed inventory.
 
 
 5
 At a later date, the corporate officers filed personal bankruptcies. In response, Transamerica filed adversary proceedings against the corporate officers to hold them personally responsible for the debts owed by Jacob's and to establish that the debts are nondischargeable. The adversary proceedings against the corporate officers were consolidated on October 27, 1987. The debtors would not ordinarily be liable for corporate debt, and they did not guarantee the debts of the corporation. Transamerica contends that because Jacob's failed to pay Transamerica the proceeds of the inventory sales when due, the debtors converted proceeds of the sales, or in the alternative embezzled the proceeds, and therefore, pursuant to 11 U.S.C. § 523(a)(6) or (a)(4), the debts are not dischargeable in the personal bankruptcies of the officers. The bankruptcy court disagreed and the BAP affirmed.
 
 
 6
 The bankruptcy court held that the method by which payments were made and inventory was handled, although intentional, did not constitute acts that necessarily produced harm. Thus, the bankruptcy court determined that the methods of payment employed by debtors did not constitute malicious injury to property under § 523(a)(6). On the embezzlement claim under § 523(a)(4), the trial court found that Transamerica did not meet its burden of proof.
 
 
 7
 The BAP noted that Transamerica waived its right to insist on a segregated account and held that the alleged conversion was excused because there were no identifiable proceeds. Moreover, the BAP found that even if Transamerica's waiver of the contract provision for a segregated account was not fatal, the debtors' conduct was not malicious under § 523(a)(6) because the conduct did not necessarily produce harm. Finally, on the embezzlement claim under § 523(a)(4), the BAP held that Transamerica did not prove that debtors had the intent to defraud.
 
 Standard of Review
 
 8
 The court of appeals and the BAP review the bankruptcy court's conclusions of law de novo and its finding of facts under the clearly erroneous standard. In re The Two "S" Corp. v. Romley, 875 F.2d 240, 242 (9th Cir.1989).
 
 DISCUSSION
 
 9
 Transamerica contends that the BAP erred in holding that Transamerica waived its lien on the proceeds from the sale of its collateral. In addition, Transamerica contends that the failure of the debtors to remit the proceeds to Transamerica was a willful and malicious injury under § 523(a)(6), and therefore the debt should not be dischargeable. Finally, Transamerica argues that debtors appropriation of the sales proceeds was an embezzlement, and consequently the debts should be nondischargeable under § 523(a)(4).
 
 I. 11 U.S.C. § 523(a)(6)
 
 10
 Section 523(a)(6) of the Bankruptcy Code provides in relevant part:(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt--
 
 
 11
 (6) for willful and malicious injury by the debtor to another entity or the property of another entity;
 
 
 12
 11 U.S.C. § 523(a)(6). "Willful and malicious" refers to "a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse." In re Cecchini, 780 F.2d 1440, 1443 (9th Cir.1986) (quoting 3 L. King, Collier on Bankruptcy § 523.16 at 523-118 (15th ed. 1983)). Our court has adopted the concept that "the conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury," constitutes a willful and malicious injury within the meaning of the § 523(a)(6). Cecchini, 780 F.2d at 1443 (citing 3 Collier on Bankruptcy, P523.15 at 523-120 (15th ed. 1983) (citations omitted)).
 
 
 13
 Transamerica contends that the debtors' failure to pay Transamerica, as the security agreement provided, constitutes conversion by the officers. The BAP held that:
 
 
 14
 [T]he disposition of Transamerica's cash proceeds collateral was not malicious under § 523(a)(6), and that even if the conduct were malicious the alleged conversion was excused by Transamerica's waiver of its contracted for protection in the form of a segregated account.
 
 
 15
 In re Littleton, 106 B.R. 632, 636 (9th Cir.BAP 1989). Without deciding whether the alleged conversion was excused by Transamerica's waiver of its cash segregation account, we resolve the issue of dischargeability on the basis of the individual debtors' conduct.
 
 
 16
 For a debt to be nondischargeable under § 523(a)(6) the debtors' injury to Transamerica's property must have been both willful and malicious. Transamerica can prevail only by showing by a preponderance of the evidence, see Grogan v. Garner, --- U.S. ----, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991); that the debtors acted both willfully and maliciously when they did not segregate the funds and did not pay Transamerica.
 
 
 17
 The word willful means deliberate or intentional. Cecchini, 780 F.2d at 1443 (quoting 3 L. King, Collier on Bankruptcy § 523.16 at 523-118 (15th ed. 1983)). In the instant case, the debtors paid Transamerica as required under the security agreement up to and including June 5, 1986. The debtors understood that by using the proceeds from the sale of collateral to pay other business debts while Transamerica remained unpaid, they were violating the security agreement. Thus, the debtors acted deliberately and intentionally and therefore, under Cecchini, they acted willfully.
 
 
 18
 The more difficult question is whether the debtors' conduct in violating the security agreement amounts to a malicious act. In Cecchini, we said:
 
 
 19
 When a wrongful act such as conversion, done intentionally, necessarily produces harm and is without just cause or excuse, it is "willful and malicious" even absent proof of a specific intent to injure.
 
 
 20
 Id. (emphasis added). Thus, under our Cecchini decision, malice may be inferred from the nature of the wrongful act. In addition, under Cecchini, when establishing malice, it is not necessary to show that the debtors intended to injure Transamerica; it is only necessary to show that the debtors committed a wrongful act which necessarily produced harm and was without just cause or excuse.
 
 
 21
 The bankruptcy court ruled that in light of the debtors good faith and sincere intentions to keep the business going, their actions were not ones that would necessarily produce harm. The court said:
 
 
 22
 [T]he defendants at all times were acting with the hope and expectation, perhaps improvidently, but sincerely hoped they could keep the business going.
 
 
 23
 [T]he method by which the payments were made, and the inventory was handled, although it was intentional, did not constitute acts that necessarily produced harm.
 
 
 24
 The bankruptcy court concluded that the debtors' acts were therefore not malicious.
 
 
 25
 The BAP affirmed the bankruptcy court's ruling. In doing so, the BAP rejected Transamerica's argument that if the act complained of is done intentionally and causes injury, then the resulting debt is nondischargeable. The BAP stated that "[t]he decision in Cecchini does not stand for the proposition that any disposition of collateral in violation of the security agreement creates a nondischargeable debt." Littleton, 106 B.R. at 637; See Davis v. Aetna Acceptance Co., 293 U.S. 328, 332-333 (1934). The BAP read "the words 'necessarily produces harm' to mean that the act must be targeted at the creditor, at least in the sense that the act is certain or almost certain to cause financial harm." Id. at 638 (emphasis added). This interpretation of "necessarily produces harm" is consistent with the standard formulated by the court in Cecchini.
 
 
 26
 Transamerica argues the BAP committed error by requiring proof of the debtors' subjective intent to harm or target Transamerica. The BAP, however, did not require proof of subjective intent to harm. Under the ruling of the BAP, an act is targeted at the creditor, if the predictable result of the debtors' intentional act would almost certainly be harmful to the creditor. It does not mean that the purpose of an intentional act must be to cause harm to that creditor. As set forth in Cecchini, the act must necessarily cause harm to the creditor, but the creditor need not show that the debtor acted with an intent to harm the creditor.
 
 
 27
 The bankruptcy court concluded that the methods by which Jacob's made payments and handled inventory did not constitute acts that necessarily produced harm. Furthermore, the bankruptcy court found that at all times the debtors were acting with the hope and expectation of saving the business and that they cooperated with Transamerica by seeking additional financing that would allow Jacob's to stay in business. Additionally, the debtors offered a third trust deed on their residence as additional security for the loan. Moreover, there was no evidence that the debtors used any of the proceeds for their personal benefit, or that any other creditor was paid other than in the ordinary course of business in the month before insolvency proceedings were filed.
 
 
 28
 Considering these facts, it was not clearly erroneous for the bankruptcy court or the BAP to conclude that the debtors' acts would not have necessarily produced harm. Consequently, the debtors' conduct was not malicious, as that term is used in § 523(a)(6).
 
 II. 11 U.S.C. § 523(a)(4)
 
 29
 Transamerica contends that by not remitting the cash proceeds to Transamerica, the individual debtors engaged in embezzlement, and therefore the debt should not be dischargeable. Section 523(a)(4) of the Bankruptcy Code does not allow an individual debtor to discharge a debt incurred by "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Clearly, a debt can be nondischargeable for embezzlement under 523(a)(4) without the existence of a fiduciary relationship. In the Matter of Shuler, 21 B.R. 643 (Bankr.D.Idaho 1982); In re Talcott, 29 B.R. 874, 878 (Bankr.D.Kan.1983).
 
 
 30
 Under federal law, embezzlement in the context of nondischargeability has often been defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." Moore v. United States, 160 U.S. 268, 269 (1885). Embezzlement, thus, requires three elements: "(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud." In re Hoffman, 70 B.R. 155, 162 (Bankr.W.D.Ark.1986); In re Schultz, 46 B.R. 880, 889 (Bankr.D.Nev.1985).
 
 
 31
 Transamerica contends that when the individual debtors did not segregate the proceeds and did not pay Transamerica, they intended to defraud Transamerica, and therefore the debtors embezzled the proceeds. Transamerica relies on California Penal Code § 504b, which reiterates the federal requirement of intent to defraud when proving embezzlement.
 
 
 32
 Whether the debtors intended to defraud Transamerica is a question of fact. The bankruptcy court held that Transamerica did not meet its burden of proof on the embezzlement claim. The BAP affirmed this ruling stating that the bankruptcy court's finding that
 
 
 33
 at all times the debtors acted with the intent to benefit the corporation by securing financing so that the company could pay all its debts ... negates any contention that the debtors intended to defraud Transamerica.
 
 
 34
 Littleton, 106 B.R. at 639.
 
 
 35
 Given the bankruptcy court's finding that the debtors applied their entire effort and resources to make the business survive and that this was their dominant motivation, it was not clearly erroneous for the BAP to hold that the debtors did not act with the intent to defraud Transamerica. The BAP correctly affirmed the bankruptcy court's decision that the debtors did not commit embezzlement. Therefore, the debts to Transamerica are dischargeable.
 
 
 36
 AFFIRMED.
 
 
 
 [1]
 The following facts are largely taken from the Bankruptcy Appellate Panel's (BAP) opinion with some additions from the parties' briefs. The facts are undisputed