**In re Steven Gregory BAMMER, Debtor.**

**James M. MURRAY, Appellant,**

v.

**Steven Gregory BAMMER, Appellee.**

**No. 95–16310.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 7, 1996.

Decided May 6, 1997.

Chester J. Peterson, Lerch, McDaniel & Kaup, Phoenix, AZ, for appellant.

No appearance by the appellee.

Before: RONEY,* BEEZER and TROTT, Circuit Judges.

BEEZER, Circuit Judge:

James Murray, a creditor of Steven Bammer, appeals a final judgment of the Bankruptcy Appellate Panel ("BAP"). The BAP held that Bammer's actions were not malicious within the meaning of 11 U.S.C. § 523(a)(6) and that Bammer's debt to Murray was dischargeable. We have jurisdiction pursuant to 28 U.S.C. § 158(d) and affirm.

I

Alta Bammer, Steven's mother, embezzled money from Murray and others through fictitious real estate transactions between 1985 and 1990. Her residential mortgage payments were delinquent, and that, coupled with other credit difficulties, impaired her ability to obtain a further loan secured by a third mortgage. She informed Steven of her legal and financial difficulties. By agreement, she conveyed her residential property to her son without consideration and with the understanding that he would obtain a loan using the property as collateral. No judgment liens were recorded against the property at the time of the conveyance.

The proceeds of the loan were to be used to pay Alta Bammer's debts. Alta and Steven Bammer agreed that the encumbered property would be sold and the net proceeds of sale were to be applied in payment of the mortgage debt. Steven Bammer testified that, although he considered himself able to make payments on the third mortgage loan, he did not intend to have to make these payments because of the Bammers' plan to sell the property.

When the loan closed in November 1990, most of the proceeds were applied in payment of past due and future mortgage payments and in satisfaction of other debts incurred by Alta Bammer. Alta Bammer received the balance of the third mortgage loan proceeds and applied them to her personal use. Steven Bammer transferred the property back to his mother in April 1991.

At nearly the same time Bammer obtained the loan, Murray brought actions for fraud against Alta Bammer and for fraud and fraudulent conveyance against Steven Bammer. A restitution lien in favor of Murray was recorded against the property in April 1991 after Steven Bammer had conveyed the property back to his mother. Although the Bammers had planned to sell the property quickly, it did not sell until November 1991. In March 1992, a California state court awarded Murray a judgment of more than $107,000 against Alta and Steven Bammer jointly and severally. Steven Bammer filed for bankruptcy in June 1992. Murray sought to have his judgment against Steven Bammer declared nondischargeable under 11 U.S.C. § 523(a)(6). The bankruptcy court determined that Bammer had "just cause" for his actions and concluded that his debt to Murray was dischargeable. The BAP affirmed.

II

We review decisions of the BAP de novo. *In re Alsberg*, 68 F.3d 312, 314 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1568, 134 L.Ed.2d 667 (1996). We review the bankruptcy court's findings of fact for clear error. *Id.*

The Bankruptcy Code is "designed to afford debtors a fresh start, and we interpret liberally its provisions favoring debtors." *In re Bugna*, 33 F.3d 1054, 1059 (9th Cir. 1994). Exceptions to discharge under 11 U.S.C. § 523, consistent with effectuating the underlying purposes of the bankruptcy code, are to be construed narrowly. *In re Riso*, 978 F.2d 1151, 1154 (9th Cir.1992).

III

11 U.S.C. § 523(a)(6) provides:

---

* The Honorable Paul H. Roney, United States Circuit Judge for the Eleventh Circuit, sitting by designation.

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or the property of another entity[.]

A "willful and malicious" act, for purposes of 11 U.S.C. § 523(a)(6), has been characterized as "a wrongful act, done intentionally, which necessarily causes injury and is without just cause or excuse." *In re Cecchini,* 780 F.2d 1440, 1443 (9th Cir.1986).

■ We need not consider whether the conveyance from Alta Bammer to Steven Bammer was fraudulent or whether Steven Bammer's actions in obtaining a secured loan constituted common law fraud or deceit. These matters are inherently state law questions that have been resolved by California state courts in this matter.[1] Dischargeability in bankruptcy proceedings, conversely, is entirely a federal law question upon which the bankruptcy court received evidence, especially on the issue of whether Bammer's actions were "malicious" within the meaning of 11 U.S.C. § 523(a)(6).

■ We have considered both objective facts and subjectively held beliefs of the debtor in determining whether an individual's conduct was malicious. *See, e.g., In re Littleton,* 942 F.2d 551, 555–56 (9th Cir.1991) (acknowledging that the debtors' actions violated loan agreements with creditor, and that

debtors' efforts to make business survive, rather than personal gain, was debtors' "dominant motivation"). A debtor is not free to injure others maliciously, however, and escape liability for his actions by pleading that he subjectively held a belief that his actions would lead to good. Instead, the debtor's subjectively held beliefs are examined for their objective reasonableness. This inquiry falls to the bankruptcy court, where the objective reasonableness of a debtor's actions implicitly or explicitly will be considered in the determination whether a debtor's actions were willful and malicious.

■ The court made a number of findings regarding Bammer's beliefs and motivations. The court found Bammer credible when he testified that he did not obtain the loan as a way of unjustly enriching himself at the expense of creditors, but rather, as a way to help his mother with expenses he viewed as critical. The court also accepted Bammer's testimony that he and his mother planned to sell the property soon after obtaining the third mortgage loan.

In addition to finding that Bammer acted out of compassion for his mother, the bankruptcy court made a number of objective findings. The court found that the property conveyance by mother to son without consideration violated a California statute against fraudulent conveyances. It found that Bam-

---

1. California Superior Court found Steven Bammer had violated the California statute against fraudulent conveyances. *See* Cal.Civ.Code §§ 3439.04, 3439.05. The dissent makes a number of references to Bammer's "fraud." The bankruptcy court at several points termed Bammer's violation of the California's statute concerning fraudulent conveyances "constructive fraud."

Constructive fraud is quite different from actual fraud, however. Sections 1572–73 of the California Civil Code define actual and constructive fraud. They provide:

§ 1572. **Actual fraud**
Actual fraud, within the meaning of this Chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:
1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true;
3. The suppression of that which is true, by one having knowledge or belief of the fact;
4. A promise made without any intention of performing it; or
5. Any other act fitted to deceive.
§ 1573. **Constructive fraud**
Constructive fraud consists:
1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or,
2. *In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.*
§§ 1572–73 Cal.Civ.Code (emphasis added).

mer did not exert any personal control over the loan proceeds.

Taken together, we conclude that Bammer's motives and the lack of personal benefit he derived from obtaining the loan are compelling reasons favoring discharge of his debt to Murray. *See Littleton*, 942 F.2d at 554–56. The California statute against fraudulent conveyances provides that the remedies for its violation may include civil liability for transferees who receive the property. *See* Cal.Civ.Code § 3439.08. Civil liability does not equal nondischargeability, however. Although Bammer did accept conveyance of his mother's property without consideration, this was not an element of a scheme to injure creditors by wasting the proceeds of the loan and then declaring bankruptcy. After carefully reviewing the record, we conclude that Bammer's actions were not malicious within the meaning of 11 U.S.C. § 523(a)(6) and that his debt to Murray was properly discharged.

AFFIRMED.

TROTT, Circuit Judge, dissenting:

## I

## BACKGROUND

The questions (1) of what constitutes "just cause or excuse" under section 523(a)(6) of the Bankruptcy Code, and (2) by what appellate standard of review we measure this issue are important matters of first impression. Because I respectfully believe the majority is wrong as to both, I write separately to dissent. If the result my able colleagues reach is correct, something is seriously wrong with the law.

Between 1985 and 1990, Alta Bammer embezzled $900,000 from various victims, including $160,000 from James Murray. She subsequently told her son Steven Bammer about her crime spree and the mess she had created. Both of them understood she was on her way to prison. In fact, she was negotiating a plea agreement that contemplated restitution. Nevertheless, Steven and Alta secretly hatched and implemented a scheme with respect to her equity in an asset she should have used to make good on her impending promise to compensate her victims: her home.

The scheme, which depended entirely on the complicity of Steven, allowed her by way of a fraudulent conveyance to him to milk $50,000.00 out of her real property. Steven's involvement was essential because both of them knew she would be unable to obtain a loan against her property on her own, so he covertly obtained one on her behalf. He admits he obtained the loan with no intention to repay it, giving new meaning to the covenant of good faith and fair dealing that accompanies all contracts.

More to the point, however, the bankruptcy court concluded on the basis of the evidence that Steven *knew* that by securing the loan, Murray would be deprived of the immediate ability to satisfy all or a portion of his restitution judgment against Alta. In other words, Steven knowingly injured a victim's right to restitution for a crime covered by the Victim Witness Protection Act, 18 U.S.C. § 3663. Alta Bammer then used the $50,000.00 loan money obtained for her by her son not to pay her victims, but for personal expenses-including $15,000 for her criminal defense lawyer in connection with a pre-indictment felony plea in federal court.

While a conniving Steven was securing on behalf of his insolvent felon mother a loan against the property fraudulently conveyed to him, Murray was filing and pursuing civil lawsuits in state court against both Bammers, for fraud and for a fraudulent conveyance of the real property at issue. Steven, of course, was not bound by the order of restitution against his mother in the criminal case. Eventually, Murray won a judgment against Steven and his mother awarding him substantial damages. The judgment conclusively held that Alta's original transfer of the home to Steven was fraudulent. The judgment reads in part as follows:

2. As to defendants Alta B. Bammer and Steven G. Bammer, Judgment shall be entered in favor of plaintiff James M. Murray as follows:

A. As to the action filed as Case No. 641672, James M. Murray is hereby

awarded $107,647.86 against defendant Alta B. Bammer;

B. As to the action filed as Case No. 651470, James M. Murray is hereby awarded $107,647.86 in damages against defendants Alta B. Bammer and Steven G. Bammer, jointly and severally, due to the transfer of the real property commonly known as 26902 La Vonne Lane, Huntington Beach, California, which transfer was a fraudulent transfer pursuant to Civil Code sections 3934.04[sic] and 3439.05.[1]

Just as important to the instant case as the judgment itself, however, are the findings of the Superior Court in Murray's civil case against Steven on which the judgment was based:

(By Judge T. Thrasher)

What is James Murray's damages, if any, *as to Steven Bammer?* The judgment will be the $157,647.86. [sic].

And the basis for that is the court's finding that the transfer from Alta to Steven was with *actual intent* to hinder at least, delay any of her creditors and/or *to defraud any of her creditors, specifically Mr. Murray.*

Reporter's Transcript, Feb. 25, 1992, p. 24 (emphasis added). Thus, the record contains a finding by the Superior Court of an actual intent in the loan scheme to defraud Murray, a finding made part of Murray's complaint in the bankruptcy court as Exhibit "A", and a finding entitled to respect in the federal courts.

Not surprisingly, Steven Bammer then filed for bankruptcy in order to shed this substantial debt owed to Murray arising from the judgment.

## II

### THE DEFINITION OF "MALICIOUS"

This appeal focuses on Section 523(a)(6) of the Bankruptcy Code, which states:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(b) for willful and malicious injury by the debtor to another entity or the property of another entity;

. . .

11 U.S.C. § 523(a)(6).[2]

Because Steven Bammer accepts the finding of the bankruptcy court that the fraud was "willful," the only question remaining is whether it was "malicious." He says it was not. The bankruptcy court and the BAP agreed with him. I do not.

The law of our circuit defines a "malicious" injury as involving (1) a wrongful act, (2) "done intentionally, [3] which necessarily causes injury, and [4] is done without *just* cause or excuse." *In re Cecchini,* 780 F.2d 1440, 1443 (9th Cir.1986) (emphasis added). This four-part definition does *not* require a showing of biblical malice, i.e., personal hatred, spite, or ill-will. *Id.* at 1442–43. Nor does it require a showing of an intent to injure, but rather it requires only an intentional act which causes injury. *Id.* Moreover, we held in *In re Britton,* 950 F.2d 602, 606 (9th Cir.1991) that a court applying this test must take into consideration a policy that favors the victims of fraud over the perpetrators.

The bankruptcy court and the BAP concluded as to the first three elements of malice that Steven Bammer's conspiratorial acts were (1) wrongful, (2) intentional, and (3) *necessarily caused harm to Murray,* but they let Bammer off the hook on the fourth element because he did all of this "out of compassion for his mother," and did not himself directly benefit financially from the scheme.

## III

### STANDARD OF REVIEW

The issue we review is very narrow. Steven Bammer's case rises or falls on whether he had a "just cause or excuse" for his injury to Murray's interests. The first three elements of *Cecchini's* definition of "malicious"

---

1. The correct Code sections are *3439.04* and 3439.05. Section 3934.04 does not exist.

2. Murray originally based his claim of nondischargeability on section 523(a)(2)(A) and (a)(4), as well as (a)(6), but narrowed it to the latter at trial.

are all questions of fact which we review for clear error. The fourth element, "just cause or excuse," however, presents us with a mixed question of law and fact. A mixed question of law and fact occurs when the historical facts are established; the rule of law is undisputed, i.e., "just cause or excuse"; and the issue is whether the facts satisfy the legal rule. *Pullman–Standard v. Swint*, 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1790 n. 19, 72 L.Ed.2d 66 (1982); *Moss v. Commissioner*, 831 F.2d 833, 838 n. 9 (9th Cir.1987); *United States v. McConney*, 728 F.2d 1195, 1200 (9th Cir.1984) (en banc). Mixed questions presumptively are reviewed by us de novo because they require the consideration of legal concepts and the exercise of judgment about the values that animate legal principles. *Boone v. United States*, 944 F.2d 1489, 1492 (9th Cir.1991); *McConney*, 728 F.2d at 1204. The question of whether a cause is "just" is a textbook example of a legal conclusion informed by historical facts. Accordingly, although the bankruptcy court's finding of compassion is reviewed for clear error, we review de novo the conclusions of the courts below that Steven Bammer had "just cause" for his knowingly injurious act.[3]

## IV

### ANALYSIS

How can a cause be "just" when it entails helping an embezzler avoid restitution for her crimes, and when the expression of the cause involves intentional fraud? The question answers itself. "Just fraud" in this context is an oxymoron, one that sets the modifier on its head and renders the rule of law temporarily insane. *Any* dictionary one consults defines "just" as "honorable and fair in dealings and actions," "consistent with moral right," and "valid within the law." Such a meaning is flatly incompatible with Steven's knowing and purposeful interference with Murray's right to restitution, and to link the two together in a legal holding is pure cognitive dissonance. Compassion he may have had for his mother, but surely not for Murray. This incident is not an example of what

cultural commentators mean when they talk about the need to restore "family values."

The bankruptcy court and the BAP mistakenly conflated the maternal object of Steven Bammer's misguided compassion with the targets of mother and son's fraudulent scheme. It is simply wrong to discount the defrauded creditors. Bammer's motive towards his mother is inextricably intertwined with his guile and deceit towards Murray and the other victims of his mother's thefts. At the very least, any compassion he had for his mother was more than negated by his knowing, wrongful, and unjust treatment of her victims. The bankruptcy court's own holding on this score regarding Steven Bammer's knowledge and intent is dispositive and deprives his cause of any justice whatsoever:

> This Court concludes that Murray obtained a judgment of restitution which was docketed in California in April, 1991, shortly after the loan transaction. *Because Murray had also been telephoning Alta Bammer at the time of the loan transaction in November, 1990, the Defendant knew that the obtainment of the loan would necessarily deprive Murray of the immediate ability to satisfy all or a portion of his restitution judgment.* Utilizing the *Gee* analysis, it was foreseeable that the actions complained of would necessarily cause the harm. The Defendant presented no controverting evidence on this issue.

(emphasis added).

California Civil Code Sections 3439.04 and 3439.05, for which Steven Bammer was found liable, is fraud *against creditors*. What the courts below did not adequately recognize is that the debt in this case arises from a judgment of willful fraud, not an ordinary commercial transaction gone sour. Given (1) the corrupt particulars of Steven Bammer's conduct, (2) the finding of the Superior Court of an actual intent to defraud, and (3) the finding of the bankruptcy court that Steven knew that the loan would hurt Murray's right to collect on his restitution judgment, the

---

**3.** Were we to review this issue for clear error, I would nevertheless reverse the courts' judgments.

majority's preoccupation with formal labels, i.e., "actual" versus "constructive" fraud, seems patently irrelevant. *See Lawrence T. Lasagna, Inc. v. Foster,* 609 F.2d 392, 396 (9th Cir.1979) (fraudulent conduct by a debtor is a ground for nondischargeability in bankruptcy); *Ellwanger v. McBroom Estate (In re Ellwanger,* 105 B.R. 551 (9th Cir. BAP 1989)). Equally irrelevant is the fact that Steven himself did not directly benefit from this scheme. A thief who gives his loot to another is no less a thief. Stripped bare, the majority's remarkable holding is that Steven Bammer had just cause for the knowing, intentional, and damaging fraud he successfully perpetuated against the victims of his mother's felonious embezzlements.

The root of the mistake made by the courts below was to have permitted a purely subjective element, i.e., "compassion," to constitute "just cause or excuse." Neither the courts below nor Steven Bammer have "cited any authority or even made a credible argument that ... subjective intent justifies or excuses" behavior that is otherwise wrongful. *In re Gee,* 156 B.R. 291, 295 (Bankr. W.D.Wash.1993), *aff'd* 173 B.R. 189 (9th Cir. BAP 1994). I can think of no reason consistent with section 523 and the purposes of the Bankruptcy Code to permit a standardless, unmeasurable, emotional, and nonlegal concept such as compassion to negate an identifiably and *legally* wrongful act. Contrary to Judge Beezer's implication, the "subjective considerations" in *In re Littleton,* 942 F.2d 551 (9th Cir.) were *not* used by the court to determine "just cause or excuse," but only to measure whether the debtor's acts would have necessarily produced harm-*Cecchini's third* element. *Id.* at 555. In the instant case, this separate question of whether Steven's acts would cause harm was decided *against* Steven by the bankruptcy court in a specific finding.

As a matter of law, Steven Bammer's unprincipled behavior cannot be regarded as "just." To do so is inconsistent with the basic policy of granting discharge of debts, which is to give the "honest but unfortunate debtor a fresh start." *Brown v. Felsen,* 442 U.S. 127, 128, 99 S.Ct. 2205, 2208, 60 L.Ed.2d 767 (1979). In 1991, the Supreme Court

shed light on how this concept of an honest but unfortunate debtor works in the context of section 523, calling it a *limitation,* and saying, "We think it unlikely that Congress, in fashioning the standard of proof that governs the applicability of [section 523(a)], would have favored the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud." *Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). We then held in *In re Britton,* 950 F.2d at 606, that the Supreme Court's concerns articulated in *Grogan* against giving the perpetrators of fraud a fresh start over their victims are applicable when deciding pursuant to section 523(a)(6) whether an injury was malicious. *Id.* In so holding, we stated that a goal of the Bankruptcy Code is to protect certain classes of creditors whom a debtor has harmed by egregious conduct. With all respect, the majority's opinion breaks loose from these moorings.

What Steven Bammer did in this case was neither honest nor the product of misfortune. To detoxify his activity with "compassion" is to sully the concept. He and his mother simply compounded her felonies by manipulating a loan company and disabling her victims from adequately recouping their losses. The United States Code says that "[w]hoever, knowing that an offense against the United States has been committed, ... relieves, comforts or assists the offender in order to prevent ... his punishment is an accessory after the fact." 18 U.S.C. § 3. One clear purpose of the Victim Witness Protection Act is to advance the penal goals of the state, i.e., to punish a defendant. *United States v. Cloud,* 872 F.2d 846, 854 (9th Cir.1989); *United States v. Johnson,* 983 F.2d 216, 220 (11th Cir.1993) ("[T]hough restitution resembles a judgment 'for the benefit of' a victim, it is penal rather than compensatory."). Because of his knowledge and intent, Steven was functionally an accessory after the fact to Alta's crimes. Given this result, including the fact that we wipe out a valid state court judgment, it is no wonder many honest people currently regard the bankruptcy system as a pernicious safe haven for crooks and swindlers. Effectively, the bankruptcy system has been skillfully used here to defeat

the Victim Witness Protection Act and the strong public policy represented by it. I cannot believe that the fresh start concept was intended for this sorry behavior. Thus, I respectfully dissent.